# EXHIBIT G

# ENVIRONMENTAL LIABILITIES TRANSFER AGREEMENT

This **Environmental Liabilities Transfer Agreement** (this "**Agreement**"), is made and entered into by and between **DETREX CORPORATION**, a Michigan corporation (the "**Seller**"), **ENVIRONMENTAL LIABILITY TRANSFER, INC.**, a Missouri corporation (the "**Buyer**") (Seller and Buyer may hereinafter collectively be referred to as the "**Parties**"), and **Commercial Development Company, Inc.**, a Missouri corporation (the "**Guarantor**").

**WHEREAS,** Buyer is in the business of purchasing environmental liabilities;

**WHEREAS,** the Seller is or may be responsible for certain environmental liabilities including the performance of environmental obligations relating to a portfolio of real property more particularly described on the attached **Exhibit "A"** (the "**Property**" or "**Properties**");

**WHEREAS,** Seller has disclosed to Buyer that the Properties are or may be contaminated with Pollutants in excess of the concentrations that satisfy state and federal cleanup criteria for unrestricted residential, commercial or industrial use;

**WHEREAS,** Seller desires to transfer unto Buyer and Buyer desires to acquire from Seller environmental liabilities and obligations associated with the Property upon the terms and conditions contained herein;

**WHEREAS,** Seller further desires to sell and transfer title to Buyer of the Properties which are owned by the Seller (being more particularly described on the attached **Exhibit "A-1"**) together with all easements and other rights appurtenant to such real property and any buildings and improvements on such real property and all fixtures attached thereto, and all equipment, and personal property owned by Seller and located in, on, or about such real property, and any other rights and interests related thereto expressly described herein (the "**Exhibit A-1 Properties**"); and

**WHEREAS,** the Guarantor, having substantial common ownership and management of Buyer, acknowledges that it will derive direct and indirect benefits from this Agreement, and in order to induce Seller to enter into this Agreement, hereby guaranties Buyer's responsibilities, liabilities and obligations under this Agreement.

**NOW, THEREFORE,** in consideration of the terms and conditions of this Agreement, and the mutual promises and covenants herein, Seller and Buyer hereby agree as follows:

1.  **DEFINITIONS.** In addition to the terms defined above and elsewhere in this Agreement, the following terms shall have the following meanings for purposes of this Agreement:

"**Adverse Condition Termination Notice**" has the meaning given in Section 4(a).

"**Assignment of Claims**" has the meaning given in Section 7.3(f).

"**Assignment of Leases, Contracts, Licenses and Permits**" has the meaning given in Section 7.3(b).

"**Assumed Obligations**" has the meaning given in Section 9.1.

"**Buyer Indemnity Costs**" has the meaning given in Section 10.3.

"**Buyers Parties**" has the meaning given in 10.3.

- 1 -

9073398.1 07354/057942

"**Clean-Up**" means the investigation, study, remediation, removal, transportation, disposal, treatment (including in-situ treatment), management, stabilization, containment or neutralization of Pollutants and any monitoring, closure, maintenance, repair, replacement and reporting activities that may be required after the completion of such investigation, study, remediation, removal, transportation, disposal, treatment (including in-situ treatment), management, stabilization, containment or neutralization.

"**Clean-Up Costs**" means all costs, expenses, liabilities and obligations incurred for Clean-Up of Pre-Existing Pollution Conditions. Clean-Up Costs shall include, but are not limited to, study and investigation costs, planning costs, consultant costs, transportation costs, legal fees, permit fees and costs, filing fees, monitoring costs, Governmental Authority oversight costs and costs to retain any licensed professionals for review and oversight in lieu of or on behalf of the Governmental Authority pursuant to Environmental Laws. For purposes hereof, Clean-Up Costs shall include the funding of any financial assurance mechanism as required by any Governmental Authority.

"**Closing**" has the meaning given in Section 7.1.

"**Closing Date**" has the meaning given in Section 7.1.

"**Contract Price**" has the meaning given in Section 2.1.

"**Documents and Information**" has the meaning given in Section 3.

"**Due Diligence Period**" has the meaning given in Section 4.

"**Effective Date**" means the last date this Agreement is signed by Seller and Buyer.

"**Environmental Laws**" means any federal, state, local, or common law (including, but not limited to, statutes; rules; regulations; ordinances; guidance documents; and governmental, judicial, or administrative orders or decisions; directives; permits; licenses; and approvals) that are applicable to Pollution Conditions.

"**Environmental Clean-Up Liability**" means, any Legal Obligation to perform Clean-Up of Pre-Existing Pollution Conditions and/or pay for Clean-Up Costs.

"**Excluded Matters**" has the meaning given in Section 9.2.

"**Governmental Authority**" means any federal, state, or local governmental entity, agency, commission, department, board, court, tribunal, arbitral body, or other governmental authority or subdivision, department, or branch of any of the foregoing.

"**Insider Claims**" means any claim of liability made by one Seller Party or Seller Parties against another Seller Party or Seller Parties. For the Purposes of the definition of Insider Claims, Seller Party or Seller Parties shall not include contractors.

"**Leases, Contracts, Licenses and Permits**" means any leases, contracts, easements, access agreements, licenses, occupancy agreements, permits, authorizations, approvals, decrees, and orders all as relating to the use, access to, operation, maintenance and/or Clean-Up of the Property and other contracts of any kind or nature to which Seller is a party and which (a) are in full force and effect as of the date of this Agreement and will remain in effect after the Closing and (b) may continue to affect the Property after the Closing if assigned to, and assumed by Buyer in accordance with the terms and conditions of this Agreement.

- 2 -

"**Legal Obligation**" means any requirement under any Environmental Laws and/or Leases, Contracts, Licenses and Permits.

"**Past Unpaid Costs**" has the meaning given in Section 9.2.

"**Personal Guaranties**" has the meaning given in 7.4(b).

"**Pollutants**" means any substance, whether solid, liquid, or gaseous: (i) which is listed, defined, or regulated as a "hazardous material," "hazardous waste," "solid waste," "hazardous substance," "toxic substance," "pollutant," "contaminant," "chemical substance," "pesticide," or otherwise classified as hazardous or toxic, in or pursuant to any Environmental Laws; or (ii) which is or contains asbestos, polychlorinated biphenyls, radon, urea formaldehyde foam insulation, explosives, or radioactive materials; or (iii) which is or contains any petroleum, hydrocarbons, petroleum products, or crude oil, and any components, fractions, or derivatives thereof listed, defined, or regulated under any Environmental Laws; or (iv) which causes or poses a threat to cause contamination or nuisance, or a hazard to the environment or to human health or safety of persons, provided that the threat or hazard is actionable under Environmental Laws.

"**Pollution Conditions**" means the presence, disposal, discharge, dispersal, release, escape, or migration of any Pollutants into or upon land, any structure on land, the atmosphere, or any watercourse or body of water, including groundwater.

"**Pre-Existing Pollution Conditions**" means Pollution Conditions existing or present at, on, above, under, within, migrating from, or transported for the purpose of disposal from the Property prior to the Closing Date, and shall include, without limitation, (i) the effects of continuing releases or migration of such Pollution Conditions occurring on or after the Closing Date; and (ii) any Pollution Conditions caused by Buyer Parties after the Closing Date, either by act or omission.

"**Remedial Escrow Agent**" has the meaning given in Section 2.1.

"**Remedial Escrow Agreement**" means that Remedial Escrow Agreement in the form attached hereto as **Exhibit "D"**.

"**Sales Proceeds Escrow Agreement**" means that Sales Proceeds Escrow Agreement in the form attached hereto as **Exhibit "E"**.

"**Seller Indemnity Costs**" has the meaning given in Section 10.1.

"**Seller Parties**" has the meaning given in Section 10.1.

2. **EARNEST MONEY DEPOSIT, CONTRACT PRICE, AND PAYMENT.**

2.1 **Earnest Money Deposit, Contract Price, and Payment.** At Closing, Seller shall pay the sum of Eleven Million Seventy Five Thousand and 00/100 Dollars ($11,075,000.00) (the "**Remedial Funds**") to J.P. Morgan Chase, N.A. as escrow agent (the "**Remedial Escrow Agent**") to be held in escrow pursuant to the terms and conditions of the Remedial Escrow Agreement and, additionally, Seller shall pay the Buyer at Closing the sum of One Million Eight Hundred Thousand and 00/100 Dollars ($1,800,000.00) (the "**Risk Premium & Mobilization Fee**, subject to pro-rations and adjustments hereinafter described, by federal wire transfer of funds. At Closing, Seller shall deliver title and possession of the Exhibit A-1 Properties, which Buyer and Seller have agreed are valued at Eight Hundred Thousand and 00/100 Dollars ($800,000.00) as set forth on Exhibit "A-1" (collectively with the

- 3 -

Remedial Funds and the Risk Premium & Mobilization Fee, the **"Contract Price"**). Nothing herein shall be deemed or construed to limit Buyer's obligations under this Agreement to the amount of the Remedial Funds or Contract Price.

### 2.2 Pro-rations and Adjustments.

(a) **Taxes & Permits.** At or before the Closing, Seller shall pay all ad valorem taxes assessed with respect to the real property and personal property and equipment for the Exhibit A-1 Properties, for the calendar years prior to the year of Closing to the extent the same have become due and payable. To the extent such taxes for the calendar years prior to the year of Closing have not become due and payable, then, at Closing, Buyer shall be entitled to an increase in the Contract Price for such amounts. At Closing, Buyer shall pay to Seller, or Seller shall receive a credit against Buyer's Risk Premium & Mobilization Fee on account of the ad valorem taxes paid and attributable to the period from the Closing Date and December 31 of the year of Closing, a prorated sum equal to the total of such taxes for the year of Closing multiplied by the proportion of the total days in the year of Closing that are included in such period. With respect to all property appearing on **Exhibit "A"**, all annual costs, expenses, and fees associated with maintenance of governmental permits transferred at closing (**"Annual Permit Cost"**) shall be prorated as of the date of Closing with the total Annual Permit Cost being divided by 365 days.

(b) **Release of Encumbrances.** On or before Closing, Seller shall cause to be satisfied or released, at Seller's cost, any and all assessments, liens, security interests, mortgages, or deeds of trust and other encumbrances securing the payment of money affecting the Exhibit A-1 Properties, and arising out of the acts or omissions of Seller (**"Monetary Liens"**), provided that Monetary Liens shall not include the lien of real estate taxes or assessments (or installments thereof) not due and payable as of Closing or any governmental liens securing any Assumed Obligations.

(c) **Expenses.** At the Closing, and with respect to the Exhibit A-1 Properties, Seller shall be responsible to pay for all expenses in connection with the payment of any Monetary Liens and any recording costs to release any Monetary Liens, any transfer tax, deed stamp tax or the like, Seller's attorneys' fees, any cost charged by the Title Company to prepare the Title Commitment, one-half of the closing fees charged by the Title Company, and the cost of the Surveys. Buyer shall be responsible to pay for the recording fee for the deed, the premium for Buyer's owner's policy of title insurance (including endorsements thereto), Buyer's attorneys' fees, Buyer's expenses for tests and inspections, and one-half of the closing fees charged by the Title Company.

(d) **Fees and Costs.** All utility charges, assessments, annual permit or inspection fees, and all other expenses normal to the operation and maintenance of the Property due and payable with respect to the Exhibit A-1 Properties will be prorated as of the Closing Date. All charges and payments made or received with respect to any of the Leases, Contracts, Licenses and Permits shall be prorated as of the Closing Date.

(e) **Miscellaneous.** Any closing costs or expenses not specifically addressed in this Section 2 shall be allocated or prorated between Seller and Buyer in accordance with local conveyancing customs and practices and otherwise in furtherance of the intent of the Parties.

3. **DOCUMENTS AND INFORMATION.** Buyer acknowledges that Seller has given Buyer access to, with the right to copy, surveys; environmental assessments; geological studies; Leases, Contracts, Licenses and Permits; correspondence with governmental agencies (including violation notices); correspondence with persons/entities alleging damage and/or injury arising out of or related to the condition of the Property; financial assurance mechanisms; and reports, inspections, and studies relative to the physical (including environmental) condition of the Property (**"Documents and Information"**).

- 4 -

9073398.1 07354/057942

Buyer shall not be obligated to assume any Leases, Contracts, Licenses and Permits relating to the Property which Seller intentionally and fraudulently failed or refused to deliver to Buyer for Buyer's review as aforesaid and Seller agrees to indemnify and hold Buyer harmless from same.

4. **INVESTIGATION OF THE PROPERTY; DUE DILIGENCE PERIOD.**

(a) Commencing on the Effective Date and continuing for a period ending at 6:00 p.m. (Central Standard Time) on the thirtieth (30th) day after the Effective Date (or if such day is not a regular business day then at 6:00 p.m. (Central Standard Time) on the next business day thereafter) (such period being the "**Due Diligence Period**"), Buyer and its representatives shall, subject to the rights of existing tenants or subtenants under their respective leases or subleases, have the right, but not the obligation, to enter the Exhibit A-1 Properties for the purpose of making inspections, including structural inspections, and other non-environmental investigations and analyses. Buyer shall give Seller reasonable advance notice of all activities Buyer plans to conduct on the Exhibit A-1 Properties and the timing thereof. Seller grants to Buyer, its agents, consultants and representatives, access to the Exhibit A-1 Properties during the Due Diligence Period for the sole purpose of conducting a complete physical inspection, including, without limitation, topographical surveys and such other engineering, and mechanical inspections and investigations as Buyer may reasonably require as provided herein. Buyer shall exercise reasonable precautions not to interfere with any existing operations/occupants/tenants at the Properties.

If Buyer, in its sole discretion, determines after making these inspections and/or reviewing the Documents and Information that any aspect of any of the Exhibit A-1 Properties are not suitable or satisfactory to Buyer, then Buyer may terminate this Agreement by notifying Seller in writing of such termination on or before the last day of the Due Diligence Period (this notice is the "**Adverse Condition Termination Notice**"). If Buyer gives the Adverse Condition Termination Notice on or before the last day of the Due Diligence Period, this Agreement shall terminate simultaneously with such notice, **THE EARNEST MONEY DEPOSIT WILL BE IMMEDIATELY RELEASED BY THE TITLE COMPANY TO BUYER WITHOUT OFFSET OR DEDUCTION OF ANY KIND,** and the Parties shall have no further obligations or liabilities to each other except for those obligations that expressly survive the termination of this Agreement. If Buyer does not give the Adverse Condition Termination Notice on or before the last day of the Due Diligence Period, then Buyer will be conclusively deemed to have accepted the condition of the Property, and to have waived all rights to terminate this Agreement for such reasons.

During the Due Diligence Period and as a part of Buyer's due diligence activities and notwithstanding any confidentiality agreement to the contrary, if any, Buyer may freely communicate with any and all: (i) tenants, occupants, licensees, and/or parties to Leases, Contracts, Licenses, and Permits; (ii) utility providers; (iii) local, state and federal governmental agencies, boards, departments, and officials having jurisdiction and/or authority over the Exhibit A-1 Properties relative to the Exhibit A-1 Properties including, but not limited to, its physical condition, the zoning classification, taxation, and permitting, and the existence of any violations relating thereto.

(b) Promptly following the completion of any of the activities of Buyer or any of its agents, contractors or employees on the Property during the term of this Agreement, Buyer shall, at its sole cost, restore any portion of the Property damaged or disturbed by such activity. Buyer shall indemnify and hold Seller and its agents and employees harmless from and against any and all claims, damages, liabilities and expenses, including but not limited to attorney's fees, incurred by or asserted against Seller which arise out of or in connection with any such activities. Buyer shall, during the term of this Agreement, maintain commercial general liability insurance regarding the Property with limits of not less than $1,000,000 naming Seller as an additional insured. Prior to entering the Property, Buyer shall deliver to Seller a certificate of insurance evidencing such coverage. Buyer shall promptly forward to Seller after preparation each survey, environmental report and other study, report, test result or similar or related documents prepared by or for Buyer with respect to the Property. Buyer's obligations under this Section 4(b) shall survive the Closing or termination of this Agreement.

- 5 -

9073398.1 07354/057942

5. **TITLE AND SURVEY**. Seller has obtained, at its expense, and has provided to Buyer for each Exhibit A-1 Property (i) an ALTA form, owner's commitment for title insurance and true and correct copies of all exception documents named therein for the Exhibit A-1 Properties (the "**Title Commitment**") and (ii) an ALTA/ACSM survey with respect to the Properties according to 2011 minimum standards with Table A Options 1 – 4, 6(a), 7(a), 7(b)(1), 8, 11(a), 13, 16 and 18 (the "**Survey**"). All title matters to which Buyer has not objected are hereby conclusively deemed to have been accepted by Buyer and will be "**Permitted Title Exceptions**" hereunder provided that in no event shall Monetary Liens be Permitted Title Exceptions. All matters accepted or deemed to have been accepted by Buyer under this Section 5 are Permitted Title Exceptions hereunder. With respect to Seller's obligation to deliver title to Buyer free of Monetary Liens, Seller will cause such Monetary Liens to be released as of the Closing Date. Buyer's receipt of a title policy under the terms described in this Agreement shall be a condition to Buyer's obligation to close. In addition to the matters shown in the Title Commitment for a Property that under this Section 5 constitute Permitted Title Exceptions, Permitted Title Exceptions for a Property shall also include matters that would be revealed by an accurate survey of such Property, the rights of tenants under leases of any portion of such Property that have been disclosed under Section 3 of this Agreement, the lien of real estate taxes and special assessments (or installments thereof) not yet due and payable, and liens and other encumbrances arising out of the acts or omissions of Buyer or any of its agents, contractors or employees or consented to by Buyer.

6. **INTENTIONALLY OMITTED.**

7. **CLOSING.**

7.1 **Place and Closing Date.** The consummation of the transactions contemplated in and by this Agreement (the "**Closing**") shall take place in the offices of the Title Company.

7.2 **Possession.** At Closing, Seller shall deliver possession of the Exhibit A-1 Properties to Buyer subject to the Leases, Contracts, Licenses and Permits provided in accordance with Section 3 of this Agreement.

7.3 **Seller's Obligations at Closing.** At Closing, in addition to payment of the Contract Price as indicated in Section 2.1 hereof, Seller shall deliver or cause to be delivered to Buyer, and Buyer shall accept, the following items, all of which shall be in form and substance consistent with the terms and conditions of this Agreement and otherwise reasonably acceptable to Seller, Buyer and the Title Company and, where appropriate, shall be duly executed and acknowledged by Seller and in recordable form:

(a) **Deed.** A Special Warranty Deed, Limited Warranty Deed, or Covenant Deed, whichever is appropriate for the state in which the Property conveyed by such Deed is located, conveying to Buyer's assignee all of Seller's right, title and interest in and to the Exhibit A-1 Properties, subject only to the Permitted Title Exceptions.

(b) **Assignment of Leases, Contracts, Licenses and Permits.** Two counterparts of an assignment to Buyer, or its assigns, of all Seller's rights and interests in the Leases, Contracts, Licenses and Permits and an agreement by Buyer to assume, perform, discharge, fulfill and observe all of Seller's post-closing covenants, conditions and obligations arising thereunder (the "**Assignment of Leases, Contracts, Licenses and Permits**") in the form attached hereto as **Exhibit "B"**, provided, however, that notwithstanding the foregoing, Seller shall not assign to Buyer any of Seller's rights or interest in and to any rents or any other charges payable by any tenant or other party to Seller pursuant to the Leases, Contracts, Licenses and Permits that pertain to the period of time prior to the Closing or Seller's right to be indemnified, held harmless or defended by any tenant or other party under any of the Leases, Contracts, Licenses and Permits with respect to any event, act or omission occurring prior to the Closing.

(c) **Releases.** Written releases of any Monetary Liens then affecting the Exhibit A-1 Properties, as shown by the Title Commitment updated to Closing.

- 6 -

9073398.1 07354/057942

Case 3:21-cv-00458-KDB-DSC Document 1378-8 Filed 03/21/22 Page 7 of 20

(d) **Title Insurance Affidavit.** An affidavit and indemnity sufficient in form and substance to cause the Title Company to delete any exception for mechanics, materialmen's and similar liens from Buyer's owner's policy of title insurance.

(e) **Non-Foreign Person Affidavit.** An affidavit of Seller in form and substance reasonably satisfactory to Buyer setting forth Seller's United States taxpayer identification number and certifying that Seller is not a foreign person as that term is used and defined in Section 1445 of the United States Internal Revenue Code.

(f) **Assignment of Claims.** An assignment to Buyer or its assigns, in the form attached hereto as **Exhibit "C"**, of any and all Seller's rights, title, and interest in and to any and all: (i) claims, causes of action, suits, and inchoate rights against any person or entity not a party to this Agreement, and excluding all shareholders, employees, officers, directors, members, managers, or affiliates of Seller, for contribution, indemnification, cost-recovery, and other legal, statutory, and/or equitable remedies arising out of or related to the Assumed Obligations; and (ii) insurance proceeds relating to the Assumed Obligations, whether or not previously disclosed to Buyer prior to Closing (**"Assignment of Claims"**). In no event shall the Assignment of Claims be deemed or construed to assign to Buyer any claim for costs and expenses incurred and paid, satisfied, released and/or discharged by Seller prior to Closing. Seller agrees, post-closing, to execute any and all further instruments and/or documents deemed reasonably necessary by Buyer to give effect to this Assignment, including but not limited to power of attorney. Notwithstanding the foregoing, Seller shall not be obligated to assign to Buyer the Fifty Thousand Dollar ($50,000.00) escrow account established for the Redford, Michigan property.

(h) **Easements/Access Agreements.** Assign and deliver unto Buyer all easement and access agreements in Seller's possession to enable Buyer to fulfill its remedial obligations at the Properties.

(i) **Miscellaneous.** Any other documents reasonably required by this Agreement or the Title Company to be delivered by Seller or necessary to implement and effectuate the Closing hereunder including but not limited to the Remedial Escrow Agreement, the Sales Proceeds Escrow Agreement, an estoppel certificate from Whitesell Enterprises in a form reasonably acceptable to Buyer relating to the Cinnaminson, New Jersey property, notice letters to parties to Leases, Contracts, Licenses and Permits advising of Buyer's role, and a closing statement and documents, consents and approvals from Seller, all of which shall be in form and substance consistent with the terms and conditions of this Agreement and otherwise reasonably acceptable to Buyer and the Title Company and, where appropriate, shall be duly executed and acknowledged by Seller and in recordable form.

7.4 **Buyer's Obligations at Closing.** At Closing, Buyer shall, in addition to any other obligations of Buyer as set forth in this Agreement:

(a) **Assignments of Proceeds.** Execute and deliver unto Seller for recordation in the appropriate land records, Assignment of Proceeds as follows: For each Exhibit A-1 Property, Buyer shall execute in recordable form an Assignment of Proceeds in the form attached hereto as **Exhibit "F"** to ensure Buyer's net proceeds from the sale of any and/or all of the Exhibit A-1 Properties shall be distributed to the Sales Proceeds Escrow Agent to be held under the terms and conditions of the Sales Proceeds Escrow Agreement, which Assignment of Proceeds shall be immediately recorded with the applicable register of deeds, recorder, or other applicable governmental authority and prior to the recordation of any mortgage, deed of trust, or other security interest or lien granted or created by Buyer. Upon confirmation from the Sales Proceeds Escrow Agent of receipt of such net proceeds, Seller shall promptly execute and deliver to Buyer for recordation a "Release" of such Assignment of Proceeds. Sale of any Exhibit A-1 Property, including the sales price thereof, shall remain in Buyer's sole discretion; nothing herein shall be deemed or construed to confer upon Seller and Seller shall not have any authority or rights to control, restrict, approve, disapprove or consent to the terms and condition of any sale of Exhibit A-1 Properties. Notwithstanding the foregoing, Buyer shall not sell, convey or otherwise transfer all or any

- 7 -

9073398.1 07354/057942

Received for Filing Oakland County Clerk 6/7/2017 2:42 PM

Case 3:21-cv-00458-KDB-DSC   Document 1378-8   Filed 03/21/22   Page 8 of 20

portion of the Exhibit A-1 Properties except for a bona fide sale of all or any portion of the Exhibit A-1 Properties to an unrelated third-party.

(b) **Personal Guaranties.** Deliver unto Seller personal guaranties of Thomas E. Roberts, his spouse Karin L. Roberts, Michael J. Roberts, and his spouse Melody A. Roberts in the form attached hereto as **Exhibit "G"**, jointly and severally guarantying ELT's Assumed Obligations, which such personal guaranties shall be "capped" in the aggregate at Six Million and 00/100 Dollars ($6,000,000.00) ("**Personal Guaranties**").

(c) **Miscellaneous.** Deliver any other documents reasonably required by this Agreement or the Title Company to be delivered by Buyer or necessary to implement and effectuate the Closing hereunder, including but not limited to the Remedial Escrow Agreement, the Sales Proceeds Escrow Agreement, notice letters to parties to Leases, Contracts, Licenses and Permits advising of Buyer's role, a closing statement and documents, consents and approvals from Buyer, and Opinion Letter from outside counsel as to enforceability and authorization, all of which shall be in form and substance consistent with the terms and conditions of this Agreement and otherwise reasonably acceptable to Seller and the Title Company and, where appropriate, shall be duly executed and acknowledged by Buyer and in recordable form.

(c) **Assignment of Leases, Contracts, Licenses and Permits**. Execute and deliver to Seller the Assignment of Leases, Contracts, Licenses and Permits in the form attached hereto as **Exhibit "B"**.

7.5 **Seller's Pollution Legal Liability Policy.** Seller, at Seller's cost and expense, may at or prior to Closing procure a Pollution Legal Liability Policy covering some or all of the Assumed Obligations set forth in Section 9.1 below. In such event Buyer and Seller shall be named insured. In no event may insurer be entitled to seek subrogation against either Buyer or Seller.

8. **NOTICES**. Any notice, request, approval, demand, instruction or other communication to be given to either party hereunder, except those required to be delivered at Closing, shall be in writing, and shall be conclusively deemed to be delivered when personally delivered or when (a) transmitted by fax to the applicable fax number indicated below followed with mailing by regular United States mail or followed by mailing via overnight courier such as Federal Express, Airborne, United Postal Service or other national overnight courier service; (b) deposit for prepaid overnight delivery with an overnight courier such as Federal Express, Airborne, United Postal Service or other national overnight courier service; or (c) two (2) business days following being deposited in the U. S. mail, postage prepaid, by regular and certified mail, return receipt requested, and such notices are addressed to the following addresses:

If to Seller:  Detrex Corporation
Attn: Robert M. Currie
24901 Northwestern Hwy Suite 410
Southfield, MI 48075
Phone: (248) 358-5800
Facsimile: (248) 799-7192

With a copy to:
Mr. Kenneth von Schaumburg
Clark Hill PLC
601 Pennsylvania Ave., NW – North Bldg. Suite 1000
Washington DC 20004
Phone: 202. 772. 0904
Facsimile: 202-572-8685
kvonschaumburg@clarkhill.com

- 8 -

9073398.1 07354/057942

| | |
|---|---|
| If to Buyer: | c/o Environmental Liability Transfer, Inc.<br>Attn: General Counsel<br>1650 Des Peres Road, Suite 303<br>St. Louis, Missouri 63131<br>Phone: (314) 835.1515<br>Facsimile: (314) 835.1616<br>tpike@edcco.com |
| If to Guarantor: | c/o Environmental Liability Transfer, Inc.<br>Attn: General Counsel<br>1650 Des Peres Road, Suite 303<br>St. Louis, Missouri 63131<br>Phone: (314) 835.1515<br>Facsimile: (314) 835.1616 |

The parties may change their respective addresses and/or fax numbers for the receipt of notices hereunder by giving notice thereof to the other party in accordance herewith.

## 9. ASSUMPTION OF ENVIRONMENTAL LIABILITIES; EXCLUDED MATTERS.

9.1 **Assumption of Environmental Liabilities.** On the Closing Date, except as excluded by Section 9.2 of this Agreement, Buyer shall assume, pay and be responsible for all risks, liabilities, obligations, responsibilities, costs, and expenses of any nature whatsoever which may now exist or hereafter arise directly or indirectly from, out of, or in connection with (i) Environmental Clean-Up Liability; (ii) Pre-Existing Pollution Conditions; (iii) new Pollution Conditions arising from, relating to or associated with the Exhibit A-1 Properties; and (iv) all costs of compliance, accruing after the Closing Date, with any and all applicable Environmental Laws or other agreements affecting the Exhibit A-1 Properties, or governing or in any way relating to the generation, handling, manufacturing, treatment, storage, use, transportation, spillage, leakage, dumping, discharge, cleanup, removal or disposal of any actual, alleged or suspected Pollutants (collectively, the **"Assumed Obligations"**). Notwithstanding anything which may be construed to the contrary herein, the Assumed Obligations shall not include, and the foregoing transfer and assumption of liabilities shall not apply to, any Excluded Matters.

9.2 **Excluded Matters.** Buyer does not assume matters not within the definition of Assumed Obligations nor does Buyer assume the following specific matters, even if otherwise coming within the definition of Assumed Obligations: (i) any past unpaid costs and/or expenses arising and incurred by Seller or any predecessors-in-interest to Seller, prior to the Closing Date (including fines and penalties levied by Governmental Authorities) (the **"Past Unpaid Costs"**); (ii) liability for Insider Claims; (iii) liability for adverse environmental conditions actually known by Seller and intentionally and fraudulently withheld from Buyer by Seller; (iv) liability for matters unilaterally and affirmatively brought to the attention of regulatory agencies by Seller post-Closing previously unknown to such regulatory agencies and otherwise not required by any Environmental Laws to be disclosed by Seller; (v) liability for pre-Closing, off-site disposal of Pollutants the disposal of which would have been considered unlawful at the time of disposal; (vi) liabilities and/or obligations created pre-Closing by private party agreements (e.g. leases, purchase and sale agreements, deed restrictions) for Clean-Up to standards materially more strict than governmentally mandated standards; and (vii) for those properties not appearing on **Exhibit "A-1"**, liability for Pollution Conditions not caused by Buyer's Parties and first arising post-Closing for the reason that Buyer has no control or authority over the occupants, owners, tenants and/or licensees of such Property and, accordingly, cannot manage or control the use, operations, and activities on such Property (collectively, the **"Excluded Matters"**).

- 9 -

9.3     **Notice of Claims and Duty to Defend.** Should Seller receive or become aware of any claims, risks, liabilities, obligations, responsibilities, costs, expenses, actions, proceedings or circumstances which Seller believes or asserts come within the scope of Section 9.1 above and for which Seller intends to seek indemnification from Buyer (**"Section 9.1 Claims"**), Seller shall notify Buyer promptly, in writing, thereof including providing Buyer true and accurate copies of all pertinent documentation available to Seller to enable Buyer to assess such Section 9.1 Claims. Seller shall not settle, consent to, admit or make any voluntary payment toward any Section 9.1 Claims without prior written notice and approval of Buyer; absent such approval, Buyer shall not be liable hereunder to Seller for voluntary or consensual admissions, settlements, assumptions, payments or obligations and/or liabilities of Section 9.1 Claims, to the extent that Buyer demonstrates that it materially has been damaged by such failure. Moreover, Buyer shall defend the Seller Parties (as defined below), at Buyer's sole cost and expense and with attorneys selected by Buyer in any legal proceeding seeking to impose upon Seller any such liabilities, obligations, costs, damages and expenses for Section 9.1 Claims.

## 10.    INDEMNIFICATIONS AND RELEASES.

10.1    **Indemnification by Buyer.** Buyer shall be responsible for, and shall indemnify, protect, defend, and hold harmless Seller and Seller's affiliates, managers, members, directors, officers, shareholders, employees, trustees, beneficiaries, agents, attorneys, representatives, and contractors, and their respective successors and assigns (collectively with Seller, the **"Seller Parties"**) from and against any and all claims, demands, actions, administrative proceedings (whether formal or informal proceedings, including, without limitation, any citation, directive, order, or investigation), judgments, losses, damages, punitive damages, penalties, fines, stipulated penalties, liabilities, debts, costs, and expenses (including without limitation attorneys' fees and expenses, consultants fees, and expert fees), that arise directly or indirectly from, out of, or in connection with the Assumed Obligations or Buyer's breach of or failure to comply with its covenants or obligations under this Agreement (collectively, **"Seller Indemnity Costs"**).

10.2    **Release by Buyer.** Buyer, for itself and its affiliates, members, directors, officers, shareholders, managers, employees, trustees, beneficiaries, agents, attorneys, representatives, and contractors, and their successors and assigns, does hereby completely and irrevocably release and forever discharge the Seller Parties and their successors and assigns from any and all past, current, future, and contingent Seller Indemnity Costs of any and every kind and nature, whether currently known or unknown, including without limitation any claims sounding in tort, negligence, contract, environmental, statutory, or equitable liability or otherwise, arising out of or related to the Assumed Obligations or Buyer's breach of or failure to comply with its covenants or obligations under this Agreement.

10.3    **Indemnification by Seller.** Seller shall be responsible for, and shall indemnify, protect, defend, and hold harmless Buyer and Buyer's affiliates, managers, members, directors, officers, shareholders, employees, trustees, beneficiaries, agents, attorneys, representatives, and contractors, and their respective successors and assigns (collectively with Buyer, the **"Buyer Parties"**) from and against any and all claims, demands, actions, administrative proceedings (whether formal or informal proceedings, including, without limitation, any citation, directive, order, or investigation), judgments, losses, damages, punitive damages, penalties, fines, stipulated penalties, debts, costs, and expenses (including without limitation attorneys' fees and expenses, consultants fees, and expert fees), that arise directly or indirectly from, out of, or in connection with Section 9.2 (i) through (vi) of this Agreement or Seller's breach of or failure to comply with its covenants or obligations under this Agreement (collectively, **"Buyer Indemnity Costs"**).

10.4    **Release by Seller.** Seller, for itself and its affiliates, members, directors, officers, shareholders, managers, employees, trustees, beneficiaries, agents, attorneys, representatives, and contractors, and their successors and assigns, does hereby completely and irrevocably release and forever discharge the Buyer Parties and their successors and assigns from any and all past, current, future, and contingent Buyer Indemnity Costs of any and every kind and nature, whether currently known or unknown, including without limitation any claims sounding in tort,

- 10 -

Received for Filing Oakland County Clerk 6/7/2017 2:42 PM

Case 3:21-cv-00458-KDB-DSC   Document 1378-8   Filed 03/21/22   Page 11 of 20

negligence, contract, environmental, statutory, or equitable liability or otherwise, arising out of or relating to the Excluded Matters or Seller's breach of or failure to comply with its covenants or obligations under this Agreement.

10.5 **As Is.** Except as specifically set forth in Seller's Covenants, Representations and Warranties, Buyer is relying on its own investigation and inspection of the Property, the Title Commitments, the Surveys, any other reports, inspections or studies obtained by Buyer, all to the extent conducted by Buyer in Buyer's judgment, and Buyer shall take title to the Exhibit A-1 Property in its AS IS, WHERE IS condition, as of the Closing, based solely on such investigation and inspection. Buyer has reviewed all records provided by Seller and any Governmental Authority concerning the Property that it deems necessary, and that it is familiar with the Pollutants, natural resources, and all other relevant conditions at the Property. Buyer shall assume the risk of all conditions at the Property, excepting for the Excluded Matters. Buyer shall assume and fully perform and complete all Assumed Obligations for the Property. The provisions of this Section 10.5 shall survive the Closing without limitation.

11. **REMEDIES.**

11.1 **Default by Seller.** Buyer shall retain all legal and equitable remedies for breach or default by Seller of post-Closing obligations.

11.2 **Default by Buyer.** Seller shall retain all legal and equitable remedies for breach or default by Buyer of post-Closing obligations.

12. **COVENANTS, REPRESENTATIONS, AND WARRANTIES OF SELLER.** Seller covenants, represents and warrants to Buyer as specified in this Section 12 ("**Seller's Covenants, Representations and Warranties**"), which covenants, representations and warranties shall be considered made as of the date of this Agreement. Seller's Covenants, Representations and Warranties and Seller's liability for breach thereof shall survive the Closing for a period of one (1) year and shall not be merged into any deed or other document given at Closing.

12.1 From the Effective Date until Closing, Seller shall not execute any Leases, Contracts, Licenses and Permits or amendments or modifications thereto, affecting the Property which shall be binding on the Property or Buyer after Closing without the prior written consent of Buyer.

12.2 From the Effective Date until Closing, Seller shall maintain the Exhibit A-1 Properties in substantially the same condition existing as of the date of this Agreement, ordinary wear and tear and casualty excepted; and pay on a timely basis all bills and discharge all of Seller's obligations (but in no event the Assumed Obligations) arising from ownership, operation, management, repair and maintenance of the Exhibit A-1 Properties as payments become due.

12.3 Seller is a corporation, duly organized and in good standing under the laws of the State of Michigan and Seller has the authority and capacity to enter into and perform this Agreement, and the person who executes this Agreement on behalf of Seller has been authorized to do so.

12.4 The compliance with or fulfillment of the terms and conditions of this Agreement will not conflict with, violate, constitute a default under, or result in a breach of the terms, conditions, or provisions of any of Seller's organizational documents or any contract or agreement to which Seller is a party or by which Seller is otherwise bound.

12.5 Except as set forth in the Documents and Information under Section 3 of this Agreement, and except as otherwise disclosed in writing by Seller to Buyer, Seller is not aware of any violations or alleged violations of any federal, state or local law that materially affect the Exhibit A-1 Properties occurring in the past five (5) years,

- 11 -

9073398.1 07354/057942

and Seller has not received notice of, and is not aware of, any pending or threatened litigation, suit, administrative proceeding or eminent domain action affecting the Exhibit A-1 Properties or the sale thereof by Seller not disclosed to Buyer prior to expiration of the Due Diligence Period.

12.6 As of Closing, there shall be no Leases, Contracts, Licenses and Permits or other agreements and/or occupancies affecting the Exhibit A-1 Properties which will be binding on the Exhibit A-1 Properties after Closing, except those disclosed under Section 3 of this Agreement or consented to by Buyer.

12.7 There are no financial assurance obligations of Seller with respect to the Property other than as disclosed to Buyer in the Documents and Information provided to Buyer.

12.8 The real estate taxes or assessments for the Exhibit A-1 Properties are not the subject of pending tax appeals.

12.9 Any and all charges for material and labor provided to, incorporated in, or affecting the Exhibit A-1 Properties within the twelve (12) months immediately preceding the Effective Date have been paid in full by Seller, and Seller has paid or will pay prior to the Closing, in the ordinary course of Seller's business, all bills and other payments due in connection with the ownership, operation, construction, repair, and maintenance of the Exhibit A-1 Properties but in no event Assumed Obligations.

12.10 While Seller does not warrant the completeness, accuracy and/or correctness of the facts asserted in such information and documents prepared by third-parties, Seller warrants and represents it has not intentionally and fraudulently withheld any existing information and/or documents which materially modifies, contradicts, and/or contravenes the facts asserted therein except as provided hereunder.

12.11 Seller covenants that Seller's Manager of Environmental and Safety Compliance, David Craig, has conducted a diligent search for relevant Documents and Information. To the best knowledge of David Craig, Seller has provided Buyer with access to relevant Documents and Information identified by him.

12.12 Seller represents, with the exception of the Charlotte, North Carolina property listed on Exhibit "A-1", the Exhibit A-1 Properties are (i) currently vacant and not subject to any lease or occupancy rights of third-parties; and (ii) no third party has any right of first refusal, contract or option to purchase those Properties or any interest therein. With respect to the Charlotte, North Carolina Property, Seller represents tenant is severely delinquent in its rent obligations to Seller. Seller represents and warrants to Buyer that Seller is not in material default of such lease agreement and will indemnify, defend, and hold Buyer harmless from any claim, assertion, judgment, suit, action, obligation, or liability first arising prior to Closing. This representation and warranty shall survive closing.

12.13 None of the representations of Seller in this Agreement contains any intentionally untrue statement of a material fact or omits to state a material fact necessary in order to make any representation contained herein not misleading in light of the circumstances in which such representation is made.

12.14 Seller does not warrant that Seller owns all fixtures, equipment, and personal property located in, on, or about the Exhibit A-1 Properties.

12.15 With respect to the Cinnaminson, New Jersey property, Seller represents and warrants there are no material defaults or breaches by Seller as tenant under the Prime Lease.

13. **COVENANTS, REPRESENTATIONS AND WARRANTIES OF BUYER.** Buyer covenants, represents and warrants to Seller as specified in this Section 13 ("**Buyer's Covenants, Representations and**

- 12 -

9073398.1 07354/057942

Case 3:21-cv-00458-KDB-DSC Document 1378-8 Filed 03/21/22 Page 13 of 20

**Warranties**"), which covenants, representations and warranties shall be considered made as of the date of this Agreement. Buyer's Covenants, Representations and Warranties and Buyer's liability for breach thereof shall survive Closing for a period of one (1) year, except that Buyer's Covenants, Representations and Warranties in Section 13.6 and Buyer's liability for breach thereof shall survive without limitation. Buyer's Covenants, Representations and Warranties shall not be merged into any deed or other document given at Closing.

13.1 Buyer is a corporation, duly organized and in good standing under the laws of the State of Missouri and Buyer has the authority and capacity to enter into and perform this Agreement, and the person who executes this Agreement on behalf of Buyer has been authorized to do so.

13.2 The compliance with or fulfillment of the terms and conditions of this Agreement will not conflict with, violate, constitute a default under, or result in a breach of the terms, conditions, or provisions of any of Buyer's organizational documents or any contract or agreement to which Buyer is a party or by which Buyer is otherwise bound.

13.3 Buyer is, and after giving effect to the transaction contemplated by this Agreement, will be, solvent and is not subject to any voluntary or involuntary proceedings in bankruptcy, reorganization, dissolution or liquidation or to any assignment for the benefit of creditors, and no trustee, receiver or liquidator has been appointed for Buyer or any of its properties.

13.4 Buyer has reviewed all records provided by Seller and any Governmental Authority concerning the Property that it deems necessary, and that it is familiar with the Pollutants, natural resources, and all other relevant conditions at the Property. Buyer shall assume the risk of all conditions at the Property, excepting for the Excluded Matters. Buyer shall assume and fully perform and complete all Assumed Obligations for the Property.

13.5 Buyer has the qualifications, expertise, and experience needed to assume and perform all of the Assumed Obligations at the Property consistent with this Agreement whether in-house or through outside contractors.

13.6 Buyer shall diligently perform or otherwise supervise the Assumed Obligations in compliance with this Agreement and all applicable federal, state, or local laws, statutes, rules, regulations, ordinances, guidance documents, and governmental, judicial or administrative orders and directives, including Environmental Laws, and the standard of care and diligence normally practiced by nationally recognized firms performing services of a similar nature.

13.7 No litigation has been served upon Buyer, nor, to Buyer's knowledge, has been filed or threatened in writing which could now or in the future affect Buyer's ability to consummate the transaction or Buyer's obligations contemplated by this Agreement.

13.8 Buyer has the financial capability to perform its obligations under this Agreement and the present intent to perform its obligations as set forth herein.

13.9 Buyer and Buyer's affiliates have not materially defaulted on any environmental liability transfer agreements of which Buyer or Buyer's affiliates have been a party to or have had obligations under.

14. **INTENTIONALLY OMITTED.**

15. **ASSIGNMENT.** Buyer shall have the right to assign its rights, interests, and obligations under this Agreement to an affiliated entity of Buyer provided, however, Buyer shall not be relieved of liability hereunder.

- 13 -

9073398.1 07354/057942

16. **CLAIMS AND DISPUTES.** The exclusive venues for any and all claims and disputes arising out, or related to, this Agreement or the breach hereof shall be the United States District Court for the Eastern District of Michigan or the Oakland County Circuit Court for the State of Michigan.

17. **CLOSING CONDITIONS.** Buyer's obligation to consummate the Closing under this Agreement shall be conditioned upon the satisfaction in all material respects of each and all of the following on or before the Closing Date:

17.1 With respect to the Exhibit A-1 Properties, public water, storm water management and sewer service, electric service, gas service, television cable service, and telephone service shall be available at the boundaries of the Exhibit A-1 Properties.

17.2 With respect to the Exhibit A-1 Properties, Seller shall be able to convey to Buyer title to the Exhibit A-1 Properties as provided by this Agreement without violating any applicable law governing the subdivision of land and the Exhibit A-1 Properties shall constitute one or more separately subdivided lots or parcels.

17.3 All of the documents and other items required to be delivered by Seller to Buyer at the Closing as provided by this Agreement shall have been delivered in form and substance reasonably satisfactory to Buyer.

17.4 Seller shall have complied with, fulfilled, and performed, in each case in all material respects, each of the covenants, terms, and conditions to be complied with, fulfilled, or performed by Seller under this Agreement.

17.5 All of the representations and warranties made by Seller in this Agreement shall be true in all material non-adverse respects as of the Closing Date.

17.6 Issuance to Buyer at Closing of a pro-forma ALTA owner's policy of title insurance insuring in Buyer fee simple title subject only to the Permitted Title Exceptions.

18. **POST-CLOSING COOPERATION AND COOPERATION AS TO THIRD PARTIES.**
Following Closing, the Parties agree to reasonably cooperate with each other to effectuate and perfect the intended purposes of this Agreement which may include the execution and delivery of documents and instruments provided no such post-closing obligation to cooperate shall impose upon either party additional and substantial material legal/financial burdens. In the event consent is required from a third party to effectuate the terms of this Agreement, the Parties shall cooperate and work together in obtaining such third party consent.

19. **MISCELLANEOUS.**

19.1 **Binding Effect.** This Agreement is binding upon and inures to the benefit of the Parties hereto and their respective heirs, legal representatives, executors, administrators, successors, and assigns.

19.2 **Person Defined.** The word "person" as used herein shall include all individuals, partnerships, corporations, or any other entities whatsoever.

19.3 **Exhibits/Conflicts in Terms.** Any reference herein to any exhibits, addenda, or attachments refers to the applicable exhibit, addendum, or attachment that is attached to this Agreement, and all such exhibits, addenda, or attachments are hereby expressly incorporated into this Agreement and made a part hereof. In the event that the terms of this Agreement are in conflict with any exhibits, addenda, or attachments to this Agreement, the terms of this Agreement shall prevail.

- 14 -

9073398.1 07354/057942

Received for Filing Oakland County Clerk 6/7/2017 2:42 PM

Case 3:21-cv-00458-KDB-DSC Document 1378-8 Filed 03/21/22 Page 15 of 20

19.4     **Time Periods.** If any date, time period or deadline hereunder falls on a weekend, a state or federal holiday, or any other day on which Title Company or the governmental office for the recordation of the deed is not open for business, then such date shall be extended to the next occurring business day.

19.5     **Agreement Separable.** If any provision hereof is for any reason unenforceable or inapplicable, the other provisions hereof will remain in full force and effect in the same manner as if such unenforceable or inapplicable provision had never been contained herein.

19.6     **Counterparts.** This Agreement may be executed in any number of counterparts, each of which will, for all purposes, be deemed to be an original. Facsimile signatures shall have the same force and effect as executed originals.

19.7     **Governing Law.** This Agreement shall be governed by, and construed in accordance with the laws of the State of Michigan, without regard to its conflicts of laws rules or principles.

19.8     **Entire Agreement.** This Agreement constitutes the entire agreement between Seller and Buyer, and there are no other covenants, agreements, promises, terms and provisions, conditions, undertakings or understandings, either oral or written, between them concerning the Property other than those herein set forth. No subsequent alteration, amendment, change, deletion or addition to this Agreement shall be binding upon Seller or Buyer unless in writing and signed by both Seller and Buyer.

19.9     **Broker's Commissions.** The Parties hereby represent and warrant to each other that, in connection with this Agreement, no third-party broker or finder has been engaged or consulted by such Party or through such Party's actions (or claiming through such Party) or is entitled to commission as a consequence of this transaction. Each Party hereby indemnifies, defends and holds the other Party harmless from and against any and all claims of other brokers, finders, or the like, and against the claims of all other third parties claiming any right to commission or compensation by or through the acts of such Party or such Party's partners, agents, or affiliates in connection with this Agreement.

19.10    **Descriptive Headings.** The descriptive headings are inserted for convenience only and shall not constitute a part of this Agreement.

19.11    **Construction.** Words used in the singular number shall include the plural, and vice versa, unless the context requires otherwise. The words "include" and "including" are to be construed to mean without limitation.

20.      **Affiliate Company Guaranty.** The Guarantor irrevocably guarantees each and every representation, warranty, covenant, agreement and obligation of the Buyer and the full and timely performance of its obligations under this Agreement. This is a guarantee of payment and performance, and not merely of collection, and the Guarantor acknowledges and agrees that this guarantee is full and unconditional, and no release or extinguishment of the Buyer's responsibilities, liabilities, and obligations (other than in accordance with the terms of this Agreement), whether by decree in any bankruptcy proceedings or otherwise, shall affect the continuing validity and enforceability of this guarantee. The Guarantor hereby waives, for the benefit of the Seller, (a) any right to require the Seller, as a condition of payment or performance by the Guarantor, to proceed against the Buyers or pursue any other remedies whatsoever and (b) to the fullest extent permitted by Law, any defenses or benefits that may be derived from or afforded by Law that limit the liability of or exonerate guarantors or sureties. The Guarantor understands and acknowledges that the Seller is relying on this guarantee in entering into this Agreement.

9073398.1 07354/057942

Received for Filing Oakland County Clerk 6/7/2017 2:42 PM

Case 3:21-cv-00458-KDB-DSC    Document 1378-8    Filed 03/21/22    Page 16 of 20

SIGNATURES APPEAR ON FOLLOWING PAGE(S)

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement effective as of the Closing Date.

| | |
|---|---|
| **ENVIRONMENTAL LIABILITY TRANSFER, INC., a Missouri corporation (Buyer)** | **DETREX CORPORATION, a Michigan corporation (Seller)** |
| By: _____ | By: _____ |
| Print Name: _____ | Print Name: Thomas E. Mark |
| Title: _____ | Title: President and CEO |
| Date: _____ | Date: June 18th, 2013 |

The undersigned, by signing below, unconditionally and absolutely guarantees Buyer's responsibilities, liabilities and obligations under this Agreement.

**COMMERCIAL DEVELOPMENT COMPANY, INC.,**
A Missouri corporation (Guarantor)

By: _____

Print Name: _____

Title: _____

Date: _____

9073398.1 07354/057942

Received for Filing Oakland County Clerk 6/7/2017 2:42 PM

Case 3:21-cv-00458-KDB-DSC   Document 1378-8   Filed 03/21/22   Page 18 of 20

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement effective as of the Closing Date.

| ENVIRONMENTAL LIABILITY TRANSFER, INC., a Missouri corporation (Buyer) | DETREX CORPORATION, a Michigan corporation (Seller) |
|---|---|
| By: *[signature]* | By: _____ |
| Print Name: THOMAS E ROBERTS | Print Name: _____ |
| Title: SECTY | Title: _____ |
| Date: 6/18, 2013 | Date: _____ |

The undersigned, by signing below, unconditionally and absolutely guarantees Buyer's responsibilities, liabilities and obligations under this Agreement.

COMMERCIAL DEVELOPMENT COMPANY, INC.,
A Missouri corporation (Guarantor)

By: *[signature]*

Print Name: THOMAS E ROBERTS

Title: PRESIDENT

Date: 6/18, 2013

9073398.1 07354/057942

Received for Filing Oakland County Clerk 6/7/2017 2:42 PM

Case 3:21-cv-00458-KDB-DSC   Document 1378-8   Filed 03/21/22   Page 19 of 20

## EXHIBIT "A"

### DESCRIPTION OF ALL PROPERTIES

1. 3114 Cullman Avenue, Charlotte, NC 28206
2. 3124 Cullman Avenue, Charlotte, NC 28206
3. 2537 West Le Moyne Avenue, Melrose Park, IL 60160
4. 12886 Eaton Avenue, Detroit, MI 48227
5. 16255 Wahrman Road, Romulus, MI 48174
6. 322 International Parkway, Arlington, TX 76011
7. 325 Emmett Avenue, Bowling Green, KY 42101
8. 307 Emmett Avenue, Bowling Green, KY 42101
9. 835 Industrial Highway, Unit #1, Cinnaminson, NJ 08077
10. 9470 Copeland Street, Detroit, MI 48209
11. 1410 Chardon Road, Euclid, OH 44117
12. 312 Ellsworth Avenue, SW, Grand Rapids, MI 49503
13. 400 State Route 128, Hooven, OH 45033
14. 2263 Distributors Drive, Indianapolis, IN 46241
15. 36128 Glendale Street, Livonia, MI 48150
16. 1149 East 5th Street, Ashtabula, OH 44004
17. 26000 Capitol Avenue, Redford, MI 48239
18. 248 Chapel Road, South Windsor, CT 06074
19. 3027 Fruitland Avenue, Vernon, CA 90058
20. 6455 Strong Avenue, Detroit, MI 48211

Received for Filing Oakland County Clerk 6/7/2017 2:42 PM

9073398.1 07354/057942